Good afternoon. May it please the Court, my name is Brian Murray, and I represent the panelists in this case. This case concerns the publicly traded stock of a company called Saxton, Inc. Back in 1997, shortly before the class period began, Saxton was a small, family-owned business. A defendant, James Saxton, ran the company. That appears from the 10-Q, sorry, 10-K. I was reading last night that his son-in-law, Mr. Porry, was the chief salesman. In 1997, Mr. Porry earned over $100,000 in sales commissions. Mr. Saxton's daughter, Michelle, also worked at the company. They were basically in the construction business in Nevada, buying land, building on the land, selling the homes. The company was doing okay. As far as I went, it seemed to be pretty much like the American Dream, except, as you know, the American Dream has changed somewhat. They had the new American Dream. They said, let's go public. So they did in 1997. And shortly thereafter, that changed everything. Now they had a publicly traded stock, a stock which in some sense you consider worth more than money. First of all, after the IPO, they used some of the proceeds to pay themselves back money they had put into the company. That's fine. There's nothing wrong with that. Then they decide, well, we still have all this other stock out there. What are we going to do with it? Well, one thing you can do with stock is you can use it to make acquisitions, which they started to do, and I'll explain in a second. You can use stock for collateral for loans. So instead of putting their own money into the company, as they had done and got repaid in the IPO, now then you just get people to loan them money and use the company's stock as collateral. When I said it was a small family-run company, it remained so after the IPO. Even after the IPO, Defendant James Saxton, his son, James Saxton II, and his two daughters owned 68 percent of the public stock of the company. So they were still owning and running the company. Not only did Mr. — as I said, Mr. Saxton's son-in-law worked out the company, so did his daughter, Michelle. This was still a family business. Well, what happened after the IPO? IPO was in 1997. The shenanigans began almost immediately thereafter. In the fourth quarter of 1997, they engaged in what we called in the complaint the Corte Madera loan. This essentially, along with the U.S. mortgage loan, were nothing other than simple, what we call Enron-like transactions. As near as we can tell, the Saxton did was set up, as Enron did, what are called special purpose entities for off-balance sheet transactions. Saxton, as I said, was a construction company. They bought land, they built on the land, and then they sold the properties. That's how they made money. Except when you're buying land and building on it and you're waiting to get the money, you're not making any money. You're sitting on a big asset, a house you've built, land you've improved, but you don't have any earnings to show for that. If you're a public company, you've got to show earnings. So how did they get around that? Well, they said to a lender, loan us some money. And the lender did. In the Corte Madera loan, $2 million. What did they do with the money? In reading through the transcript of the argument before Judge Mann, which was quite a few years ago now, something one of the defendants said caught my eye last night when I was going through the transcript. It seems like in addition to having to pay the interest on the loan and being responsible for the loan, that they simply took that $2 million not as loan proceeds, but what the defendants seemed to indicate that they took it as revenue, which would be even worse. In essence, they weren't willing to wait to sell the property and get their money and realize their profits. They wanted to pretend they had earned money from building this property. So they said, oh, we earned $2 million from Corte Madera, who's paying us to build this The lender just said, here's $2 million to Saxton. Saxton said, great. Then they took it in as revenue. That was the, as I said, fourth quarter of 97. First quarter of 98, they make their first stock-for-stock transaction. They buy a company called Maxim, a builder in Utah. They buy three more properties. The company's growing. Second quarter of 1998, as I said, the U.S. mortgage transaction. This time they thought a little bigger, not $2 million. They said, let's borrow $8.5 million. Same thing, same special purpose entity. The lender's just giving them money. They're taking the money in. They have to pay the interest on the loan. They haven't really earned any income for that transaction. They haven't sold any properties yet. Third quarter of 98, once again, they said, let's go back to the stock-for-stock transaction. They buy a company called Diamond Key in Arizona. This company was much bigger, 14 properties under construction at that time. Then you get to the fourth quarter of 98. Mr. Saxton says, well, I don't want to put my own money into the company anymore like I did the last time. As I said, one thing you can do with stock, you can say to somebody, loan me money. I'll put up my stock as collateral. If I can't pay you back, you can take all my stock and get your money back that way, sell it on the open market. Of course, that only works if there's a market for the public stock, and you have to keep the market up and make sure that your collateral is still valuable. Otherwise, you're back to where they were pre-IPO, putting up their own money and buying all these properties. They said they had two special-purpose entities, the Corte Madera loan and the U.S. mortgage loan. Certainly, as we said in the complaint, the lender did not consider those loans to anybody to any person other than Saxton itself. In fact, when I get to the Deloitte part of the case, they even sent a letter to Deloitte saying, we got the schedule. You sent us for loans as part of the audit. However, you missed two, Corte Madera and U.S. mortgage. We loaned a lot of money to Saxton. This should be on your loan schedule. Where is it? Saxton also had something, properties they built, called TCPs, tax receivables. These are properties they built. They still held, and they were expecting a certain income stream from those properties. They recognized that that was an extremely large asset on their balance sheet. In fact, if you look at 1998, that is the second largest asset they have, over $30 million. There's only one problem with it. They're carrying that at a very high value. As I said, over $30 million. It wasn't worth anywhere near that. The problem with this is that if they had to sell it, they couldn't get $30 million for it. They could only get $14 million for it. Now, what they said in 1998 when they put out their 10K and they carried this extremely large asset on the balance sheet, which is going to impress their investors, impress their lenders, and let people think that they're actually sitting on something that's valuable, they said, well, this is what we think we're going to get, and if everybody pays us over the duration of the leases, we're going to get at some point $30 million, so we consider this a $30 million asset. And they also say in a footnote in that 1998 10K, we can't value this on the public market. It's just impossible. There's no way to tell if somebody, if we wanted to sell it, would pay for it, so we're not going to value it that way. We're just going to value it as what we think we're going to get over the lifetime of this property. Well, the problem was 1999 came around, and all of a sudden they said, oh, we can value it. They said they were going to sell it. Somebody put a price on it, and it was not the $31 million that they said it was worth. It was $14 million. All of a sudden, overnight, it was possible to value it. And the relevant accounting principles require that it must be valued at the lower of cost or fair market value for a variety of reasons, most of which is that it's misleading and unfair and not conservative, which is a principle that runs all throughout a gap, to do otherwise. If you're carrying an asset on your balance sheet and you say it's worth X, but if you had to sell it and you're only going to get a third of X, certainly an investor wants to know that, gee, this thing is really only worth a third of X if they have to get rid of it, it's not really a great asset at all. Kind of like you buy your house in a boom market for a million dollars. The market crashes. It hasn't recently anywhere. If you go back to the 90s, it did. You know, you can only get a half million dollars for your house. You can't go around telling people, I'm living in a million-dollar house anymore. That house is worth a half million dollars. That's what you can get for it. It doesn't matter what you paid for it. It's the same thing with the TCPs. Okay. Company goes along through 1998, as I described. Then they get to 1999. What happens in 1999? Well, they still need to make money. They still need to report they're making money. And they resort to one of the oldest tricks in the book. They simply start lying in a very simple way. I'm really not an accountant. Obviously, I'm a lawyer. I know little about accounting. One thing that the accounting experts have been able to drill into my head is a simple principle, that when a company is, a construction company like this is building a property and they incur interest costs when they're building that property, while the property is still being built, then the interest that you're accruing is not an expense on your income statement. It just gets put into the cost basis of what you're building until the construction is complete. It's very simple. If it's not complete, you capitalize your cost. If it is complete, you expense your cost. Well, Saxon seems to have forgotten that very conveniently. In the first quarter, all of a sudden, they start capitalizing interest costs that must be expensed. Now, you might say, well, anybody can make a mistake once. It's a simple principle. But, you know, mistakes happen. If Your Honors would think to your own personal taxes. You can deduct your home mortgage interest. You cannot deduct, you're probably past this stage, as even I am now, your student loan mortgage, your student loan interest. If you put your student loan interest as a deduction, that would be wrong. Well, maybe you can make that mistake once. If you did that three years in a row, the IRS would probably say, you're not making an honest mistake. You're doing this deliberately. Same thing with Saxton. Three quarters in a row. They take all of the interest on properties that have already been built, interest that has to be expensed, put down and taken off of earnings, and they put that all into capitalized costs and not into their expenses. And what does that do? Well, the three quarters makes them look great. First quarter of 1999, they said they earned 23 cents. Had they done it right, they would have earned half that, 11 cents. Interest expense would have been four times what they had reported it to be if they had done it correctly from the get-go. Second quarter, they capitalize the interest they should be expensing. They say we earned 33 cents. What did they really make? 14 cents. Interest expense should have been reported six times more than it originally was. Third quarter, they say we earned 20 cents. What did they really earn? Seven cents. Interest expense was actually nine times what they said it was when they reported those earnings. This is, as I said, one of the simplest accounting rules possible. You can't mess it up by mistake, especially a construction firm. This is their bread and butter. If they can't get this right, they don't know anything about accounting. It's just impossible. Your Honors, those are briefly the facts, and it took me a long time to go through it, and I won't apply that to the law and the various arguments made in this case. I'll deal with what I consider the easiest ones first. Defendants argue that we have not shown. Keep in mind, you have a little under eight minutes left, and you probably want some time for rebuttal. I understand, Your Honor. I'll pick up the pace. The Reliance argument, they say we have not shown that the stock was traded on an efficient market. Quite simply, it was shown in the brief. We don't have to go to any great factual showing on the complaint, and it's not an appropriate inquiry on this motion to dismiss. We had asked relief to amend. That was denied by Judge Mann, if necessary, and this Court feels that it's going to go beyond what any court has done. It requires this to be done on a motion to dismiss. We can put in that analyst cover of the stock. There's great volume in the stock, sometimes 100,000 shares a week. We'll provide a regression on that, and we'll suspend an expert. We don't think you should do this. This is notice pleading. There's no reason why it's not notice pleading on this. This is something that's subject to judgment later. This is a very high standard for pleading under the Act that this Circuit has, unusually high standards. For Sienta, Your Honor, but I don't think that goes to the Reliance requirement. The Reform Act did not touch on what the Reliance requirement was. It only raised the standard pleading for Sienta. So I don't think it's anything beyond notice pleading, and the defendants have not shown anything saying it should be. They cited two cases where this was decided on summary judgment, and maybe that's where it should be, but certainly not here at this stage. Moving on to loss causation. This case is so old, I tell people it was pre-DORA, and they say, well, that was just this year. I say, no, pre-the Ninth Circuit DORA. The law has evolved very much since this case was originally argued before judgment. And again, if leave to replete is granted, there are many things we can put in. Certainly we feel we can meet the DORA standard and the Dow standard. The Dow case decided by the Circuit simply said there just needs to be some indication the drop was causally related to the financial misstatements, and certainly we can plead that here. The press collapsed when the truth about Saxton's finances were revealed. And that's what this case is in a nutshell. They were simply lying about their earnings and their financial condition all throughout the class period. When the truth came out, the stock collapsed. I mean, it's that simple. I don't think we need to plead anything more, and I think that will satisfy DORA and Dow. And just to finish up on DORA, DORA made a great distinction between what you have to plead in the case and prove in the case for loss causation, and they pointed out pleading is governed by Rule 8, as I think the reliance ulcers should be. They said it's not a great burden, and that's a quote from the opinion. They said you just have to give an indication of the loss and the causal connection plaintiffs have in mind. And certainly we'll be able to do that. I think we've already done it, but if we need to clarify it to meet the most recent cases, I think we can. Finally, Sienter. We've cited a variety of reasons, I think, that we have satisfied the Sienter of both the Saxon defendants and Deloitte. As I said, with regard to the capitalized interest, once is a mistake, twice is extremely careless mistake, three times there's no doubt about it. You're doing it wrong, and you're doing it wrong on purpose. It's a simple rule, and they're just not following it, and there's nothing else to say about it. The – I think it was the Dow case also. We also discussed that, talking about you can infer Sienter from Gap, and the simplicity of the rules does have something to do with it. And certainly we believe it is. Same thing with the TCPs. There's no reason not to mark that to market. I mean, that was worth almost a third of what they said it was. When they wanted to do it, they did it right away. There was no reason in 1998 for them to be able to say, oh, there's just no way to value this. It's utterly impossible. And then the next year, when they need to value it, value it a week later. I mean, there's no excuse, and they just didn't want to do it. Why didn't they want to do it? Because they didn't want the truth to come out. I mean, people are going to see that they have $20 million less on the balance sheet that's not going to be good for the company. As I understand it, the district court dismissed this because of the failure to allege Sienter, right? Not the other grounds. Isn't that true? Well, it's a little tough to tell, Judge Rustani. What happened below, I think one of the prior arguers pointed out, Judge Mann, had an extensive state court background. This case came to him shortly when he got to the Federal bench. He heard arguments on the case. He reserved decision. And as state court judges sometimes do, when he decided he was going to decide in defendants' favor, he asked them to prepare an order. So the defendants prepared a brief order saying the case is dismissed for the following reasons. Could be Sienter. I mean, that's what the order said. I'm not really sure. That's exactly what it said. So how can we imply something else? Well, I'm not sure what Judge Mann had in mind. That's what the defendants wrote for the order. But yes, I mean. But he signed it. He signed it. Okay. No. All right. I assume he read it and he signed it and meant it. All right. No. He didn't send me a private note saying I had another reason and I didn't disclose it, did he? I mean, certainly. Okay. Yes. That's what the order says. But that was just background. The defendants raised the other issues. It's background for my question. Okay. All right. Okay. So since Sienter was the problem as far as the district court was concerned and he said that it would be futile to amend, what were you planning on doing and did you – what did you tell the judge you were planning on doing to cure – to amend – to cure the Sienter problem? Oh, at the argument, he did not say he was dismissing on Sienter grounds. He just said if I was going to give you leave to amend the complaint in any way at all, what would you do? And I said that would depend on what you said the deficiencies were. Right. But if you – but standing here today, how would you amend the complaint to sufficiently allege meeting the – meet the higher Silicon Graphics pleading standards for Sienter in our circuit? I think standing here today, I have a somewhat better understanding of what the Court of the off-balance sheet accounting is. We did not explain it, particularly the complaint, the way I've explained it to you here today. And I would amend the complaint in that way and I think we would – Would that go to Sienter? Yes. I think it does, Your Honor. For Deloitte and Touche as well as the officers? I mean, can you just draw me a picture here? It would certainly go to the individuals and then the company, Sienter. Deloitte's – I'm not sure. I mean, I'm not sure exactly what they knew about the special purpose entity, although in my remaining minute and 14 seconds, I'd like to talk about Deloitte's, Sienter, and perhaps it will explain the answer. Well, how do you have standing to sue Deloitte? Standing to sue Deloitte? Yes. All of the transactions, I understand, the purchases by your clients, occurred before the Otter Report, which is the subject of your claim against Deloitte, right? That is correct, Your Honor. But you do not have to have somebody who purchased at each point in the class period, before and after each false misleading statement. Right. But you don't have a certified class yet, do you? No. That is correct, Your Honor. But there are – And you don't have members that are in the class that are – you don't have class representatives as plaintiffs who could be members of the class, right? In your claim against Deloitte. Nobody who purchased after a Deloitte statement, but that's really not what's required under the law. You just have to have somebody who bought during the class period, during the fraud. Right. If you get a certified class, but we don't have that yet in this case. You don't have lead plaintiffs who have any injury that is traceable to any action of Deloitte's, do you? No, Your Honor. To answer your question directly. So your reliance only is that if you get the class certified, someone somewhere will have an action and you can rely on that. That's what you're relying on, right? No, Your Honor. It's – But this is – but in order to get – we're talking about the class period. You're talking about the entirety of transactions over the period against the company. But when you're talking about Deloitte, the only thing you have is something that occurred outside of that class's period, right? Well, no. It's within that class's period. It's a subset of the overall class period. It's not a separate class period. The class period you're talking about is the class period involving the company, not the accounting firm. Well, it's both, Your Honor. The class period against Deloitte is a subset of the class period against the company. And I do not think there are any cases that said you need to have somebody who purchased at each point in the class period for each defendant. Well, you have to have a lead plaintiff that is a member of the subset class if you're arguing against a particular defendant. You have no traceable injury to your clients from Deloitte's actions, do you? For the client on the complaint, no, Your Honor. Yeah, okay. But, again, getting back to amendment, if necessary, perhaps we can add somebody who purchased post-Deloitte. Well, my time's almost up, so I'm going to beg 10 seconds' indulgence. I believe for Deloitte Center, which I have not addressed, there are many red flags. One was the fact that they had to restate the capitalized interest expense, which should alert Deloitte that this company is not doing things right. You have the letter from Kylie, the lender, alerting them to the Corte Madera and the U.S. mortgage, which should tell them that they must take a closer look. And, finally, this is not IBM. This is not a huge company. They had a few properties. They should have been able to go out and actually determine what the TCPs were worth and value it. It wasn't like this was one of 1,000 properties, and they kind of missed it in a sampling thing. I mean, this went to the heart of the company. As I said, their second largest asset, and they should have taken a close look at that, especially in light of the other red flags. Thank you. Thank you. Furbush. Good afternoon. May it please the Court. My name is David Furbush. I represent the individual defendants in this case, James Saxton, Kurt Shearer, and Melody Sullivan. I'm splitting my time today with counsel for Deloitte and Touche, Mr. Pickett, so I'm going to try to limit my comments to 10 minutes. And the way that Mr. Pickett and I thought we would divide the argument is that in terms of talking about the specific false and misleading statements alleged in the complaint, I'm going to focus primarily on the errors in the capitalized interest calculations that ultimately led to the restatement. Mr. Pickett is going to talk in more detail about what we call the tag-along claims, basically the other alleged accounting errors that did not result in a restatement. And I want to focus on primarily the issue of scienter. We have an admitted error here. The issue is, is there any adequate allegation of scienter with regard to the error that resulted in the restatement? And I also want to talk about loss causation, which I think is a very important issue in this case, and the issue of the dismissal with prejudice without leave to amend. Why don't you start with the last issue, if you don't mind? Yes, Your Honor. I mean, it seems to me that in these cases, the general practice is to at least give the plaintiff one chance to amend, particularly after getting an opinion. I mean, at the hearing, he said, it depends on what you say in the opinion, and it was denied without leave to amend. Why shouldn't we give the plaintiff another chance to adequately meet the heightened pleading standards? And I think every case has to be looked at on its own particular facts. Nine days before the oral argument in this case, this circuit came out with its decision in the Lipton v. Pathogenesis case. I believe that case was very influential in Judge Mayen's thinking about whether or not to grant leave to amend in this case. First of all, I think it's important to describe the facts of that case. In Lipton, the court of appeals emphasized that more than six months had elapsed between the filing of the original lawsuit and the filing of the consolidated amended complaint. Then there was three months between when the defendants filed their motion to dismiss and the oral argument on that, during which the Ninth Circuit panel said they could have amended if they wanted to. And there was apparent futility. There was just no, you know, suggestion as to what they were going to do to amend. Well, those facts are almost identical to those that were before Judge Mayen. The original complaint was filed on December 22nd, 2000. Six months later, after apparently doing a lot of additional fact-gathering, they filed an amended complaint on May 14th, 2001, that for the first time asserted the claims against Deloitte and Touche. Five more months later, they filed their consolidated amended complaint, and that was on October 9th, 2001. Then the motions to dismiss were filed in November 2001 and not heard until the end of March of 2002. So there was, again, a long period of time between when the plaintiffs were on notice of what the alleged deficiencies were and when the hearing was, during which time they could have done further investigation, they could have at least come up with something to say to Judge Mayen when he asked them, what are you guys going to do if I give you leave to amend? And yet the answer was, I don't know. The issue here, and, you know, plaintiffs, I think, ignored Judge Reinhart's admonition in Eminence Capital about avoiding clichés. They've said they only got one bite at the apple in this case. As I said, that wasn't true. They actually amended multiple times and had plenty of other opportunities to amend and to say what their further amendments would be if they could do so. Here, not only were plaintiffs unable to tell Judge Mayen what their amendment would be, they've been unable to provide any specificity in their opening brief, in their reply brief, and as far as I could tell, an oral argument as to what exactly they're going to allege that will meet the pleading requirements of the Reform Act that will establish scienter in this case. And I think the only conclusion that can be drawn from the plaintiffs' silence on this subject is that they have nothing further to say. That was the finding by Judge Mayen, its utility. That's the basis on which he made this decision, and the – I think that is well supported by precedent in this circuit. Over and over again in this circuit, a plaintiff's failure to say what additional facts they would allege if given leave to amend has been deemed a strong indication that they have no additional facts to plead. And the three cases I would cite on that, Your Honors, are Silicon Graphics, and you could look at 183 F-3rd at 991, Verifone, where you could look at 11 F-3rd at 872, and the Vantive case, where I would suggest looking at 283 F-3rd at 1098. So under an abuse of discretion standard, under the clear and settled authorities in this circuit, inability to say what additional facts one would allege would seem to me to be adequate grounds to conclude that Judge Mayen did not abuse his discretion in finding futility. Turning to the issue of scienter, a restatement doesn't by itself give rise to an instance of scienter. No facts have been pledged here to show that the error was anything other than a mistake. There's no dispute that it's proper as a general proposition to capitalize interest, and, in fact, the fact that Saxton did that was fully disclosed in its SEC filings. When the error was discovered, it was small relative to total expenses. It was 5 percent of the total expenses for the periods at issue that were restated. And when they announced the restatement, when they filed their amended 10-Qs, the stock price didn't move. Investors apparently regarded the error as immaterial. There are none of the normal allegations of scienter here. Conspicuously, no insider selling. In fact, there's effectively the opposite of insider selling. The CEO, James Saxton, and his family held on to nearly 4 million shares of stock while the price went from $8 to zero. They went down with the ship, losing $30 million in paper wealth while this happened. Each of his children held more than half a million shares. What Mr. Saxton did during this time period in an effort to keep the business going was he pledged his stock to a bank, borrowed the money, and lent it to Saxton. By pledging his stock, he tied the stock up. He was now no longer able to sell it. It defies logic to suggest that Mr. Saxton would orchestrate a fraud while setting himself up and his family to be its greatest victims. There are no scienter allegations for the two CFO defendants, Mr. Shearer and Ms. Sullivan. In fact, the plaintiffs affirmatively allege that Mr. Shearer was fired in the middle of the alleged class period. Again, it makes no sense and it defies logic to suggest that Saxton would fire a co-conspirator in the middle of a fraudulent scheme. There's this allegation about the Diamond Key Homes sale, which I think we've dealt with effectively in our papers, but if the Court has any questions about that, I'll be happy to address that. I'd like to spend at least the remaining two minutes I have on loss causation. Dura, the Supreme Court's opinion in Dura, requires a showing that the stock fell significantly after the truth became known. In this case, the only allegation is that the stock price was artificially inflated during the class period, the precise allegation that the Supreme Court found to be insufficient in the Dura case. Any attempt to plead loss causation in this case would clearly be futile based upon the record before this Court. The restatement was disclosed on May 15, 2000. In the record, we have the Court took judicial notice of the stock price over the period of the class period. And the – following the announcement of the restatement, the price was constant, and if anything, went up slightly right after that occurred. There's no way that the plaintiffs can allege that the stock price fell significantly after the truth became known as to the errors that led to the restatement. The day after that, May 16, 2000, the 1999-10-K was filed. This, according to the plaintiffs, revealed the truth about the tax-credit partnership being overvalued. Again, the next couple of days, the stock price, if anything, goes up slightly. It doesn't go down. There will be no possible way that plaintiffs can argue or allege that the stock price fell significantly upon the disclosure of that. Finally, as to the other two remaining tag-along claims, the alleged secret loan in the Corte Madera transaction, the alleged premature revenue on the South Valley project, there was never any disclosure of those alleged errors to the public, never any opportunity for the stock price to drop when something was never disclosed. So for those reasons, we submit that lot salvation certainly hasn't been pled in any way in this case, meeting the Dura standard, and simply cannot be pled. Thank you, counsel. Good afternoon. My name is Don Pickett. I'm here on behalf of Deloitte and Touche. The Reform Act makes it exceedingly difficult to allege scienter, especially scienter against an auditor. This circuit, for example, in DSAM, held that allegations of, quote, a seriously botched audit, in which, quote, the auditor egregiously failed to see the obvious, stated a compelling case of negligence, perhaps even gross negligence, but did not give rise to the required strong inference that the auditor acted with an intent to defraud. The requirement of alleging specific practices that amount to no audit at all is grounded in the fact that absent special circumstances, auditors have no incentives to participate in the fraud. And here, there are absolutely no allegations whatsoever that begin to explain why Deloitte would have been motivated to put its and its individual accountant's reputations at stake in connection with this alleged fraud. The section of the complaint about motive of defendants never even mentions Deloitte, and plaintiffs never address this fundamental gap in their allegations. Moreover, the allegations in this case are virtually unique among Reform Act precedents in that they are based on a theory that plaintiffs were defrauded by two audited financial statements, the second of which disclosed the company lost over $30 million, was failing, and in dire straits. And it included an audit report from Deloitte in which Deloitte reported that these difficulties raised substantial doubt about the company's ability to continue as a going concern. Now, the usual problem in auditor fraud cases is that the auditor failed to issue a going concern warning. In this case, and not that it gave one, the only reasonable inference from the these kinds of allegations are in defendants' favor. Reporting dire financial news, issuing a going concern qualification is not the stuff of fraud and completely cuts against the inferences that plaintiff would have you take. Let's look at the three. That's the second. That's the second audit report, right? That is the second, correct. But it's part of the continuing pattern of fraud that they allege. It makes no sense that Deloitte would uncover these problems with the quarterly force restatement, put out the going concern as part of this pattern of fraud. And after the first one, there's no purchasers, right? After the first one, there are at least one purchase. Oh, there is. Yeah. Now, let's look at the three tag-along transactions. These are the only issues addressed to Deloitte. It's important to note at the outset that none of these transactions was ever restated. First is the South Valley project and revenue recognition. Plaintiffs say that the ground hadn't been broken, but they allege in their complaint that materials and supplies had been delivered to the site and that Saxton had received payment for those materials. Those allegations are entirely consistent with the completion of the completion method of revenue recognition disclosed by Saxton in its 10-K. And plaintiffs never allege any specific facts from which a contrary, a negative inference of falsity or sander could be drawn. On this allegation, there is no error, let alone fraud. Then let's turn to the two development projects. First, let's start with Corte Madera. As disclosed in its 10-K, Saxton frequently worked on, with the LLCs and partnerships on what were called design-build projects. In 1998, its 10-K disclosed that the current design-build projects underway at Saxton had an aggregate contract amount of $57.8 million. As part of a design-build project, financing would be raised for the LLC and proceeds transferred to Saxton as part of construction contract advances. Saxton was responsible for administering the project, paying all expenses, including loan payments, as pass-through payments. There's nothing sinister about these arrangements. And counsel this afternoon speaks of them as Enron-type transactions. But there's no specific allegation that that's true. There's nothing on the record that would support that. That's the kind of broad-based challenge that the Reform Act was designed to eliminate. Now, most importantly with respect to Corte Madera, plaintiff's allegations are perfectly consistent with the design-build practice. Paragraph 23 of the complaint specifically alleges that the loan was made to Corte Madera LLC, not Saxton, Inc. Once again, the allegations support the financial statements. U.S. mortgage loan is the other development transaction. And today, counsel for plaintiff, appellant, said that this was a similar type loan to Corte Madera because it was a loan made to a third party, an Enron-type transaction, a special-purpose entity. That actually is contrary to what was alleged, at least in a strictly conclusory fashion in the complaint, because in the complaint, it was alleged that there was some money loaned to Saxton. It never talks about the existence of a note payable. It never talks about documentation. It never gives any of the specifics required by the Reform Act. It never talks about what happened with the money, where it went, how it was related to the construction. In any event, these specific facts must be looked at in terms of the balance of inferences. And given Saxton's conceded common practice of design-build projects, it is at least equally plausible, if not more plausible, that this was another design-build project, just like the Corte Madera project. The far more reasonable inferences taken in this case were that Deloitte did its audit, considered all the evidence, and came up with many negative facts in connection with the company, but came up with a reasonable audit. There is absolutely no evidence of scienter, no evidence of a botched audit, let alone an audit of a problem of the rise to the level of actual fraud. Let me talk about the tax credit receivables briefly. There is the very least detail in the complaint about any of these three tag-along transactions with respect to the TCPs. It's only contained in paragraph 64 is the heart of it. The complaint alleges that the write-down was somehow related to the capitalized interest problem in 1999. But that issue was limited to the quarterlies. It was corrected before the 1999 annual financial statement issued. So there should be no problem about it. Moreover, plaintiffs concede that the amounts reported in the prior year reflected the actual amounts owed by the TCPs, and that Saxton first held the receivables for sale rather than collection, held it out for sale in late 1999, the fourth quarter of 1999. Counsel today says there's no reason not to mark it to market in 1998, but it was obvious. They didn't have to mark it to market until 1998 when it was held out, 1999, when it was held out for sale. Prior to then, it's a receivable. It's a collectible. And it can be shown at face value. Finally, a few brief points on the denial of leave to amend the issue with respect to whether Judge Mann properly dismissed with prejudice. First, plaintiffs have never argued in any of the briefs below or an oral argument or in the briefs here that they needed some more opportunity to come up with allegations. Their argument is and always has been that the current allegations of this complaint are sufficient, not that they have something more. And second, the allegations themselves demonstrate the futility of additional allegations, even if they could come up with something. They show that the financial statements were not restated. They show that serious financial difficulties, including the ability of Saxon to survive, were disclosed in the financial statements and the audit report. Third, let me just cite one more case to those listed by Mr. Furbush, the Gomper v. Vizek case, same situation. The circuit ruled that dismissal with prejudice was appropriate, 298F3rd at 898. And finally, the only answer when Your Honors posed the question to plaintiffs as to what new allegations do you have, we get the same sort of vague, nonspecific, not compliant with Reform Act requirement about some kind of allusion to off-balance sheet reporting. That is not sufficient under the Reform Act. This is a clear-cut case where the dismissal was appropriate, and it should stick up at this circuit. Thank you. Thank you, counsel. We'll have a rebuttal. We'll give you four minutes. I didn't think I'd have any time, so I wasn't really prepared to say anything. You don't need to take it. It's just if you've got more than anything. Mr. Furbush said that Mr. Saxton went down with the ship and lost $30 million, but then he also added on paper, and that's exactly right. He didn't go down with any ship. The people that went down with the ship were the poor and fortunate class members who did pay tens of millions of dollars for Saxton's stock, their own money, real money, and wound up with nothing at the end of the class period. Mr. Saxton was sitting out a family business. The stock was only worth what people would pay. He kept this going. I mean, his only hope was to keep this company going long enough so that stock would actually be worth something. And in the end, he ran out of time. The company went under. But he in no way lost $30 million and went down with any ship like the rest of the class did. They actually paid money. Mr. Saxton did not. And he was hoping his company would recover and went through one subject refuge after another in an attempt to prolong the life of his company. And as I said, he ran out of time. But he's not a victim in this. The class members are the victims. Thank you. Thank you, counsel. All right. The case to be argued will be submitted. The final case of the day.
judges: Reinhardt, Thomas, Restani